UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| DIAMOND BOLTON and | ) | |
| KYRIE TURNER, as surviving | ) | |
| Children of JOHNNY BOLTON, | ) | |
| | ) | CIVIL ACTION FILE NO. |
| Plaintiffs. | ) | |
| | ) | |
| v. | ) | 1:21-CV-04052-SEG |
| | ) | |
| SAMUEL BROCK DANIEL, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS**

COMES NOW DEFENDANT DANIEL in the above-styled action, and, pursuant to the Local Rules files his *Statement of Material Facts* in in support of his Motion for Summary Judgment as follows:

**BACKGROUND**

1.  This case arises out of the execution of a "no-knock" search warrant on an apartment by Cobb County Sheriff's Office ("CCSO") SWAT personnel. (Beasley Dep. at 11:2-4) (Poss Dep at 7:12-13) (White Dep at 10:19-21) (Mosby Dep at 37:24-25 – 38:1-2)

2.  Sergeant Brock Daniel was part of the CCSO SWAT team. (Daniel Dep. at 19:14-15; 25:12,16-25; 26:7-10; 44)

1

3.   The local drug task force had obtained two search warrants after investigation revealed that drugs were being sold from two locations. (Beasley Dep. at 11:19-23)

4.   The drug task force agents had information that the drug dealer targets were known to sell drugs in exchange for guns, were known to routinely carry guns, and had criminal histories involving violent offenses. (Beasley Dep. at 14:13-16, 17:16, 17:19) (White Dep. at Exhibit 2 pp. 4-7 (Power Point briefing plan))

**THE PRE-RAID BRIEFING**

5.   Hours before the search warrant execution, Sheriff's Office SWAT officers, including Sergeant Daniel, attended a briefing about the target assigned to them. (Daniel Dep. at 48:2-15) (Beasley Dep. at 9:20)

6.   Sergeant White briefed the SWAT team about the plan for the raid at Concord Chase apartment 505. (Beasley Dep. at 12:8)

7.   In the briefing, Sergeant White indicated that this apartment was used to store and deal narcotics. (Daniel Dep. at 61:14-16)

8.   Sergeant White explained that officers could expect occupants to be heavily armed with guns. (Beasley Dep. at 11:2-4)

9.   For example, recent activity indicated there could be a shotgun and a high powered, high-capacity semi-automatic rifle (AK-47). (Daniel Dep. at 58:23)

(Beasley Dep. at 14:13-14, 17:19)

10. Many of the suspects were reported to have prior violent felony charges and/or convictions involving firearms. (White Dep. at Exhibit 2 pp. 4-7 (Power Point briefing plan))

11. The briefing indicated that Sergeant Brock Daniel was assigned as the first SWAT officer at the door. (Berger Dep at 34:2)

12. During the briefing Sergeant White explained this apartment had a "doorman" who provided armed security for the drug operation. (Daniel Dep. at 53:15-20) (Beasley Dep. at 16:14-21, 17:4-8)

13. According to the briefing, this doorman was always seated on the couch just inside the apartment and his job was to "Keep us [law enforcement] out." (Daniel Dep. at 58:17)

## SERGEANT DANIEL ASKS FOR MORE INFORMATION ABOUT THE ARMED DOORMAN

14. Sergeant Daniel was concerned about a gunman guarding the door, so after the briefing concluded he sought more information. (Daniel Dep. at 53:2-7) (White Dep. at 19:14-17)

15. Sergeant Daniel approached narcotics task force officer Joseph Sterner and asked Sterner about the "doorman." (Daniel Dep. at 53:2-7)

16. Sterner told Sergeant Daniel that the doorman sits on the couch with a sawed

off shotgun and guards the door. (Daniel Dep. at 53:15-20)

17. Sterner explained that any time the confidential informant went to that apartment to buy narcotics, the doorman sits with a weapon pointed at the informant the entire time. (Daniel Dep. at 53:15-20)

18. Sterner elaborated that the doorman guards the door with a gun and points his gun and keeps his gun on everybody the entire time. (Daniel Dep. at 53:15-20)

19. One drug buyer told investigators he had been held at gunpoint until it was verified he was not a police officer. (Sterner Dep. at 54:8-20)

20. Upon learning about the armed doorman, Sergeant Daniel was concerned that the SWAT team's current plan needed to be modified to reduce the risk of an officer being shot. (Daniel Dep. at 54:4-6) (White Dep. at 19:14-24)

## CHANGE OF THE RAID PLAN TO ACCOUNT FOR AN ARMED DOORMAN

21. Sergeant Daniel approached SWAT team commanders about his concerns. (Mosby Dep. at 36:22-25) (Daniel Dep at 19:14-17) (Daniel Declaration at ¶ 6) (White Dep. at 19:6 – 20:2)

22. After discussion about the armed doorman, the leaders agreed with Sergeant Daniel to change the raid plan. (Daniel Declaration at ¶ 6) (White Dep. at 19:6 – 21:9)

23. Instead of rushing into the apartment after the front door breach, the officers

agreed to use a flashbang after the breach and pause at the front door to scan for threats before going into the apartment. (Daniel Declaration at ¶ 6) (Mosby Dep. at 16:15 – 17:19; 18:9-17; 36:22-25) (White Dep. at 19:14-24, 21:19-23:9)

### TRAVEL TO THE RAID

24.    After that the SWAT officers departed for the apartment, but they stopped at a church parking lot near the target location to get one last update from undercover agents watching the apartment. (Pearson Dep. at 28:12-16) (Berger Dep. at 26:6-8)

25.    The SWAT members received information about activity at the apartment that was unusual so early in the morning. (White Dep at 26:13-22)

26.    Sergeant Daniel heard a report that lights inside the apartment were being turned on and off. (Daniel Dep. at 65:9-10)

27.    Sergeant Daniel heard a report that an occupant(s) was looking out the blinds and opening and closing the front door. (Daniel Dep. at 65:7-15)

28.    Sergeant Daniel heard a report that a vehicle arrived and people went inside. (Daniel Dep. at 64:2-5; 65:7-8)

29.    Sergeant Daniel was concerned that the apartment occupants had been tipped off that police were coming. (Daniel Declaration at ¶ 8)

## APPROACH TO THE RAID SCENE

30.   Shortly before 5:00 a.m. the Sheriff's Office SWAT team was driven to the target apartment complex. (Lignitz 29:1-4) (Beasley 20:24-25, 21:1-2) (Pearson 23:22-25, 24:1-3) (Mosby 15:18-20)

31.   Most of the SWAT officers were in the back of a U-Haul truck. (Daniel Dep. at 72:25-73:1-4)

32.   The U-Haul truck was parked out of sight of the target apartment. (Daniel Dep. at 72:23-25)

33.   SWAT officers then went on foot in a line and walked toward the target apartment building. (Daniel Dep. at 73:5)

34.   Sergeant Daniel and the other SWAT officers were dressed with Sheriff's Office insignia. (Daniel Declaration at ¶ 3 & Exhibit 1)

35.   Sergeant Daniel led the SWAT team to the target apartment, 505. (Daniel Dep. at 73:11-12)

36.   When the officers got there the blinds over the windows were drawn and the lights seemed to be off. (Daniel Dep. at 82:10-14)

37.   In a front window, a small square was cut out of the blinds to be used as a view port. (Daniel Dep. at 66:1-2)

38.   The officers walked past the target apartment and stacked up in a line just

outside the front door. (Daniel Dep. at 74:9-12)

39.   Sergeant Daniel was in front of the stack of SWAT team members. (Daniel Dep.

at 74:24)

40.   Sergeant Daniel held a shield. (Daniel Dep. at 75:17-19)

## THE BREACH

41.   The plan was to breach the front door, with a nearly simultaneous flash bang

detonation behind the apartment to distract the occupants away from the front

door. (Mosby Dep at 65:20-25, 66:1-2)

42.   A supervisor gave a countdown on the radio, starting from five. (Daniel Dep. at

76:1-4) (Kite Body cam Video)

43.   At the end of the countdown, Deputy Lignitz breached the door with a ram.

(Daniel Dep. at 76:5-7) (Lignitz Dep. at 36:22-25)

44.   The rear flash bang detonated.  (Daniel Declaration at ¶ 10-11 & Exhibits 2 and

3)

45.   When the front door was breached, SWAT team members began to yell

"Sheriff's Office! Search Warrant!"  (Beasley Dep. at 23:15-22, 24:1-4)

46.   Police vehicles outside activated blue lights. (Beasley Dep. at 24:5-6)

47.   After the breach Sergeant Pearson reached around Sergeant Daniel and threw a

flashbang inside, which detonated within seconds. (Pearson Dep. at 39:9-21,

40:14-19)

48.  Both flashbangs can be heard on a video recording from an officer who was listening to the countdown over the radio. (Daniel Declaration at ¶ 10-11 & Exhibits 2 and 3)

49.  The rear flashbang detonated approximately two seconds before the front flashbang. (Daniel Declaration at ¶ 10-11 & Exhibits 2 and 3)

50.  The front room filled with smoke from the flashbang detonation. (Daniel Declaration at ¶ 12)

## SERGEANT DANIEL SCANS FOR THREATS

51.  After the door opened, Sergeant Daniel scanned the room from left to right, attempting to discern whether any occupant presented a threat. (Daniel Dep. at 87:8-15)

52.  To Sergeant Daniel's left, he immediately saw a male seated near the front door. (Daniel Dep. at 88:22-25 – 89:1-2)

53.  The man was within ten feet of Sergeant Daniel. (Daniel Dep. at 88:10-15) (Stuart Dep. at Exhibit 2) (Stuart Dep. at 50:4-7)

54.  Sergeant Daniel repeatedly yelled "Sheriff's Office, show me your hands!" (Daniel Dep. at 90:9-23) (Berger Dep. at 53)

55.  The man turned towards Sergeant Daniel, put his hands up above his head with

his palms facing out, then he dove onto the floor. (Daniel Dep. at 89:17-21)

56.   Sergeant Daniel recognized this man was no threat, so he scanned to his right.

(Daniel Dep. at 90:7-8)

57.   Sergeant Daniel then saw another man standing in the living room with a

cigarette. (Daniel Dep. at 91:13-15)

58.   This man also put his hands above his head and he dove to the floor. (Daniel

Dep. at 91:17-19, 22)

## DISCOVERY OF MR. BOLTON

59.   Sergeant Daniel then made a final pivot to his right, still at the doorway. (Daniel

Dep. at 93:6-12)

60.   Then Sergeant Daniel saw a man seated on a couch, which was situated against

the wall to Sergeant Daniel's right. (Daniel Dep. at 94:21)

61.   The man was facing Sergeant Daniel, with his right foot on the floor and his left

leg on the couch. (Daniel Dep. at 114:5 – 115:2)

62.   The man's arms appeared to be in a classic shooting position, stable and

focused and pointing at Sergeant Daniel. (Daniel Dep. at 95:3-6) (Daniel

Declaration at ¶ 14)

63.   Sergeant Daniel was a firearms instructor. (Daniel Dep. at 19:6-7; 112:11-13)

64.   In Sergeant Daniel's experience the only reason for anyone to assume the arm

position of the man on the couch was when holding a gun. (Daniel Declaration at ¶ 15)

65.   Sergeant Daniel believed the man was pointing a gun at him and the other officers at the door. (Daniel Dep. at 95:3-9, 122:17 – 123:8)

66.   Sergeant Daniel  immediately yelled in fear of being shot by the man. (Daniel Dep. at 98:13-15)

67.   Sergeant Daniel is the only person who actually saw Bolton's hand positioning and contents just before the shots were fired. (Daniel Dep. at 95:3-9, 122:17 – 123:8) (see Statements 111 – 115 below (explaining why witnesses McMurrain and Scott did not see Bolton before he was shot, with record citations))

68.   Sergeant Daniel was approximately six to eight feet from the end of the man's hands. (Stuart Dep. at 50:17 -   51:8 & Exhibit 2 (scene diagram with dimensions)) (Daniel Dep. at 94:21, 99:3-6, 116:9-20 (fired from the front doorway while Bolton was on the couch))



10

69. Sergeant Daniel responded by firing three times at the man. (Daniel Dep. at 98:4-5)

70. Sergeant Kite's bodycam recorded the sounds of the countdown, the flashbangs and the gunshots. (Daniel Declaration at ¶ 10-11 & Exhibits 2 and 3)

71. The first gunshot occurred close in time to the interior flashbang detonation. (Daniel Declaration at ¶ 10-11 & Exhibits 2 and 3)

72. All three shots occurred within approximately one second. (Daniel Declaration at ¶ 10-11 & Exhibits 2 and 3)

73. Through the shield Sergeant Daniel saw an orange light that he believed was a muzzle flash. (Daniel Dep. at 95:19-22)

74. Sergeant Daniel yelled "gun, gun, gun!" and tucked back behind the door frame to check himself for bullet wounds. (Daniel Dep. at 98:8-18)

75. Sergeant Daniel stated that Bolton had something in his hands. (Pearson Dep. at 44:8-10)

76. Sergeant Daniel was convinced he had been shot at. (Daniel Dep. at 96:24)

77. Lieutenant Mosby came to the door and Sergeant Daniel explained he shot the man on the couch. (Daniel Dep. at 117:7-10)

78. Sergeant Daniel urged that the man needed medical attention. (Daniel Dep. at 117: 11-12)

## BOLTON'S WOUNDS

79. The man on the couch was Johnny Bolton. (Daniel Dep. at 93:12-16) (Doc. 1 at ¶ 26)

80. One bullet struck Bolton's left arm, then passed into his chest near his left armpit. (Dr. Desamours Dep. at 14:12-25, 42-44 & Exhibit 27)

81. A second bullet passed through Bolton's right forearm, entering through the dorsomedial (outside, opposite the palm side) side. (Dr. Desamours Dep. at 16: 7-9, 57:10 - 21 & Exhibit 26)

82. A bullet was recovered from Bolton's right chest. (Dr. Desamours Dep. at 25:15-16)

83. A third bullet struck a desk behind the west couch and was recovered from a chair. (Stuart Dep. at 16:12-24, 23 & Exhibit 6)

84. A GBI crime scene expert tested the bullet from the chair for blood, and found there was no blood on the bullet. (Stuart Dep. at 22:15-25 & Exhibit 12)

85. The bullet from the chair was a hollow point slug with only minimal damage to the projectile. (Stuart Dep. at 17:24-25, 18:3-22 & Exhibits 6 & 12)

86. There is no evidence that the bullet from the chair struck Bolton before it hit the desk and chair.  (Stuart Dep. at 17:24-25, 18:3-22, 22:17-18 & Exhibits 6 & 12)

87. Because there were only three bullets and one did not strike Bolton, the bullet

that went through Bolton's right forearm is the same bullet that struck his right chest. (Dr. Downs Dep. at 52:1-7, 54:1-4, 64-66 & Exhibit 29 at 15-16, 19) (Stuart Dep. at 17:24-25, 18:3-22, 22:17-18 & Exhibits 6 & 12)

88.   When the wound to Bolton's right forearm is lined up with the wound to Bolton's right chest, Bolton's right forearm had to be out in front of him and positioned near his midline when the bullet struck. (Dr. Downs Dep. at 64-68 & Exhibit 29 at 15-16, 19)

**AFTERMATH OF THE SHOOTING**

89.   After he was shot, Bolton took a kneeling position with his knees on the floor and his upper body on the west couch. (Beasley Dep. at 26:9-12) (Gorski 32:18-20)

90.   Apartment occupants were ordered to come out, and eventually all except Bolton came out through the front door. (Beasley Dep. at 21:19-21)

91.   As soon as officers had cleared all other occupants from the apartment, two officers took Bolton outside where medics attended to him. (Lignitz Dep. at 44:4-8, 45:24 – 46:13)

92.   Because one of the bullets struck an artery, Bolton died from blood loss. (Dr. Desamours Dep. at 15:14-18)

## GBI'S SCENE INVESTIGATION

93.   In light of the officer-involved shooting, the Georgia Bureau of Investigation (GBI) conducted an investigation. (Stuart Dep. at 5 & Exhibit 10)

94.   GBI officers arrived at the Concord Chase Apartments within hours of the raid. (Stuart Dep. at 5:25; 6:1-5)

95.   By about 10:00 a.m. on the morning of the raid, GBI crime scene investigators began identifying and collecting evidence from the apartment.  (Stuart Dep. at 6:4-7)

96.   A nine millimeter semi-automatic pistol was found in the kitchen, roughly 6 yards away from the couch where Bolton had been positioned. (Stuart Dep. at 52:8-21 & Exhibit 2 (position 8 labeled "Gun") and Exhibit 5 page 4) (MSJ Exhibit 2)[1]

97.   An unspent nine millimeter bullet was found in the couch where Bolton had been. (Stuart Dep. at 10-11 & Exhibit 3)

98.   A box of shotgun shells was discovered in a utility closet. (Stuart Dep. at 14:19-21 & Exhibit 8)

99.   A Motorolla brand cell phone was on the same couch. (Stuart Dep. at 12:8-10, 13:14-17 & Exhibit 4)

---

[1]   The dimensions measured by the GBI agent provide a basis for calculating unmeasured distances through standard mathematics. The mathematical explanation is provided in MSJ Exhibit 2.

100.  The Motorolla phone had blood on the outside. (Stuart Dep. at 13:20-25; 14:1-18 & Exhibit 4)

101.  Bolton's hands had blood on them. (Dr. Desamours Dep. at 17:19 – 18:8, 20:13 – 20:14 & Exhibits 23 (page 3) & 24 (page 3)).

102.  On the inside of each hand, there was little or no blood on an area the size and shape of a cell phone. (Dr. Desamours Dep. at 17:19 – 18:8, 20:13 – 20:14 & Exhibits 23 (page 3) & 24 (page 3))

103.  Bolton's cell phone was recovered from the couch where he was sitting, and it was covered with blood. (Stuart Dep. at 13:14 – 14:10 & Exhibit 4)

104.  The blood stain patterns on Bolton's hands indicate that Bolton had a cell phone grasped between his hands, which kept blood from staining the parts of his hands pressing against the cell phone. (Dr. Desamours Dep. at 17:19 – 18:8, 20:13 – 20:14 & Exhibits 23 (page 3) & 24 (page 3))

105.  The medical experts agree that just before he was shot, Bolton's hands could have been together and he could have been holding an object. (Dr. Sperry Dep. at 63:8 – 64:6) (Dr. Downs Dep. at 89:20 – 90:8) (Dr. Desamours Dep. at 50:22 – 51:14)

106.  Bolton was known to point his cell phone like a gun, on occasions when he did not have a gun but wanted to make someone believe he had a gun. (Grand Jury

Transcript (Sterner testimony) at 150:15 – 151:10)

## FORENSIC TESTING RESULTS

107. Data from Bolton's cell phone shows cell phone activity up to the point of the raid. (Sterner 111:9-18)

108. Blood taken from Bolton's body indicates he was under the influence of cocaine at the time he was shot. (Dr. Desamours Dep. at 69:25,70:1-6; 71:22 - 72:1)

109. Based on the bullet holes created in the desk, a GBI investigator determined the trajectory of the bullet.  (Stuart Dep. at 16:2-5; 24:13-17)

110. The bullet trajectory was downward from the front door, over the west couch where Bolton was sitting and into the desk.  (Stuart Dep. at 25-27, 28:24-25; 29:1-4; 31:9-17 & Exhibit 7)



111. While two apartment occupants (Shanda McMurrain and Gregory Scott) claim that Bolton was standing up with his arms out to his sides when he was shot, all

medical experts agree that the wounds on Bolton's body and the bullet trajectory performed by GBI indicate that the stories of McMurrain and Scott cannot be true. (Dr. Desamours Dep. at 91:2 - 92:1-4) (Dr. Sperry Dep. at 87:2-10, 29:5-13, 61:1-16 & Exhibit 2) (Dr. Downs Dep. at 43:4-10, 53:3-9, Exhibit 29 at 19) (Doc. 29-1 at 19 (expert report))

112.  The stories of Ms. McMurrain and Mr. Scott, about Mr. Bolton's arm positioning at the time of the shooting, also contradict the original stories that these witnesses (McMurrain and Scott) told to the GBI on the day of the incident. (McMurrain Dep. at 31:13-17 (asserting under oath she told the truth to GBI)) (McMurrain GBI interview recording at 15:10 *et seq*. (Q: "Did you see anybody get shot?" A: "**No, I didn't see anyone get shot**. … Did someone get shot?")) (Scott GBI interview recording at 1:30 – 5:00 (repeatedly stating at the time of the shooting he was in the kitchen and dropped to the floor; no claim he saw the shooting) (McMurrian Dep. at 32:5-11; 42:23-25; 43:4-6; 59:7-12)

113.  Both McMurrain and Scott tell the same suspiciously similar, demonstrably false story, each after extensive discussions with Plaintiffs' counsel. (McMurrian Dep. at 45-46; Scott Dep. at 115)

114.  Both witnesses refused to disclose the content of discussions with Plaintiffs' counsel, claiming privilege. (McMurrian Dep. at 46-48) (Scott Dep. at 109-116)

115.   When asked about her discussions with Plaintiffs' counsel, Ms. McMurrain

repeatedly asserted her Fifth Amendment privilege against self-incrimination,

thereby indicating that truthful disclosures about her discussions with Plaintiffs'

counsel would incriminate her. (McMurrian Dep. at 46-48)

Respectfully submitted,
WILLIAMS & WAYMIRE, LLC

/s/ *Jason Waymire*
Jason C. Waymire
Georgia Bar No: 742602
Attorney for Defendant

4330 South Lee St., NE
Building 400, Suite A
Buford, Ga 30518-3027
Telephone: (678) 541-0790
Facsimile: (678) 541-0789
jason@wmwlaw.com