IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DIAMOND BOLTON, *et al*., Plaintiffs,　)
　　　　　　　　　　　　　　　　　　)　　　CIVIL ACTION FILE
　　vs.　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)　　NO.1:21-CV-04052-SEG
SAMUEL DANIEL, Defendant.　　　　)

**DEFENDANT'S SUMMARY JUDGMENT BRIEF**

COMES NOW DEFENDANT SAMUEL BROCK DANIEL and submits his

Brief in Support of his Motion for Summary Judgment as follows:

**INTRODUCTION**

Plaintiffs filed this lawsuit under 42 U.S.C. § 1983 based on an incident

where Sergeant Daniel shot decedent Johnny Bolton in the course of executing a

high-risk search warrant. Defendant moves for summary judgment as to all claims,

and submits that qualified immunity and official immunity protect him from

liability. The facts are set forth in *Defendant's Statement of Material Facts*, filed

herewith and incorporated here.

**SUMMARY OF PERTINENT FACTS** [1]

This case arises out of the execution of a "no-knock" search warrant on an

apartment by Cobb County Sheriff's Office ("CCSO") SWAT personnel. (Mosby

Dep at 37:24-25 – 38:1-2) Sergeant Brock Daniel was part of the CCSO SWAT

---

[1] The material facts with record citations are voluminous and set forth in
*Defendants' Statement of Material Facts*. Because of the Local Rule page
limitation, only an abbreviated set of facts is set forth here.

team. (Daniel Dep. at 44) The local drug task force had obtained two search warrants after investigation revealed that drugs were being sold from two locations. (Beasley Dep. at 11:19-23) The drug task force agents had information that the drug dealer targets were heavily armed and had criminal histories involving violent offenses. (White Dep. at Exhibit 2 pp. 4-7 (briefing plan)) (Sterner Dep. at 54:8-20, 73:1-11)

### THE PRE-RAID BRIEFING

Hours before the search warrant execution, Sheriff's Office SWAT officers, including Sergeant Daniel, attended a briefing about the target apartment, Concord Chase apartment 505. (Daniel Dep. at 48:2-15) In the briefing, Sergeant White indicated that this apartment was used to store and deal narcotics. (Daniel Dep. at 61:14-16) Sergeant White advised that officers could expect occupants to be heavily armed with guns. (Beasley Dep. at 11:2-4) (Daniel Dep. at 53:10-24, 58:13-24) For example, recent activity indicated there could be a shotgun and a high powered, high-capacity semi-automatic rifle (AK-47). (Daniel Dep. at 58:13-24) (Beasley Dep. at 14:13-14, 17:19)

Sergeant Daniel was assigned as the first SWAT officer at the door. (Berger Dep at 34:2) During the briefing an officer explained this apartment had a "doorman" who provided armed security for the drug operation. (Daniel Dep. at 53:10-20, 58:13-24) According to the briefing, this doorman was always seated on

the couch just inside the apartment and his job was to "Keep us [law enforcement] out." (Daniel Dep. at 58:17)

## SERGEANT DANIEL ASKS FOR MORE INFORMATION ABOUT THE ARMED DOORMAN

Sergeant Daniel was concerned about a gunman guarding the door, so after the briefing concluded he sought more information. (Daniel Dep. at 53:2-7) (White Dep. at 19:14-17) Sergeant Daniel approached narcotics task force officer Joseph Sterner and asked Sterner about the "doorman." (Daniel Dep. at 53:2-7) Sterner told Sergeant Daniel that the doorman sits on the couch with a sawed off  shotgun and guards the door. (Daniel Dep. at 53:15-20)

Sterner explained that any time the confidential informant had gone to that apartment to buy narcotics, the doorman pointed a weapon at the informant the entire time. (Daniel Dep. at 53:15-20) Sterner elaborated that the doorman sits on a couch with a sawed-off shotgun and hold drug buyers at gunpoint until they left. (Daniel Dep. at 53:15-20) One drug buyer told investigators he had been held at gunpoint until it was verified he was not a police officer. (Sterner Dep. at 54:8-20)

Upon receiving information about the armed doorman, Sergeant Daniel was concerned that the SWAT team's current plan needed to be modified to reduce the risk of an officer being shot. (Daniel Dep. at 54:4-6) (White Dep. at 19:14-24)

## CHANGE OF THE RAID PLAN TO ACCOUNT FOR ARMED DOORMAN

Sergeant Daniel approached SWAT team commanders about his concerns.

(Mosby Dep. at 36:22-25) (Daniel Dep at 19:14-17) (Daniel Declaration at ¶ 6) (White Dep. at 19:6 – 20:2) After discussion about the armed doorman with Sergeant Daniel, the leaders agreed to change the raid plan. (Daniel Declaration at ¶ 6) (White Dep. at 19:6 – 21:9) The officers agreed that, instead of rushing into the apartment after the front door breach, they would use a flashbang after the breach and would pause at the front door to scan for threats before going into the apartment. (Daniel Declaration at ¶ 6)  (White Dep. at 19:14-24, 21:19-23:9)

## APPROACH TO THE RAID SCENE

Before the raid approached, SWAT members received information about activity at the apartment that was unusual so early in the morning. (White Dep at 26:13-22) (Daniel Dep. at 65:7-15) Therefore, Sergeant Daniel was concerned that the apartment occupants had been tipped off that police were coming. (Daniel Declaration at ¶ 8) Shortly before 5:00 a.m. the Sheriff's Office SWAT team was driven to the target apartment complex. (Beasley Dep. at 20:24-25, 21:1-2) Sergeant Daniel and the other SWAT officers were dressed with Sheriff's Office insignia. (Daniel Declaration at ¶ 3 & Exhibit 1)

Sergeant Daniel led the SWAT team to the apartment. (Daniel Dep. at 73:11-12) The apartment blinds were drawn and the lights seemed to be off. (Daniel Dep. at 82:10-14) The officers walked past the target apartment and stacked up in a line just outside the front door. (Daniel Dep. at 74:9-12) Sergeant Daniel was in front of

4

the stack of SWAT officers. (Daniel Dep. at 74:24) Sergeant Daniel held a shield that said "Sheriff." (Daniel Dep. at 75:17-19, 81 & Exhibit 4)

## THE BREACH

The plan was to breach the front door and have a nearly simultaneous flash bang detonation behind the apartment to distract the occupants away from the front door. (Mosby Dep at 65:20-25, 66:1-2) A supervisor gave a countdown on the radio, starting from five. (Daniel Declaration at ¶ 10-11 & Exhibits 2 and 3)

At the end of the countdown, Deputy Lignitz breached the door with a ram, (Lignitz Dep. at 36:22-25), and a flash bang was detonated behind the apartment. (Daniel Declaration at ¶ 10-11 & Exhibits 2 and 3) When the front door was breached, SWAT team members began to yell "Sheriff's Office! Search Warrant!" (Beasley Dep. at 23:15-22, 24:1-4) Law enforcement vehicles outside activated blue lights. (Beasley Dep. at 24:5-6)

After the breach Sergeant Pearson reached around Sergeant Daniel and threw a flashbang inside, which detonated within seconds. (Pearson Dep. at 39:9-21, 40:14-19) The front room filled with smoke from the flashbang detonation. (Daniel Declaration at ¶ 12)

## SERGEANT DANIEL SCANS FOR THREATS

After the door was breached, Sergeant Daniel began to scan the room from left to right, attempting to discern whether any occupant presented a threat. (Daniel

Dep. at 87:8-15) To Sergeant Daniel's left, he immediately saw a male seated near the front door. (Daniel Dep. at 88:22-25 – 89:1-2) The man was within ten feet of Sergeant Daniel. (Daniel Dep. at 88:10-15) (Stuart Dep. at 50:4-7 & Exhibit 2) Sergeant Daniel repeatedly yelled "Sheriff's Office, show me your hands!" (Daniel Dep. at 90:9-23) The man turned towards Sergeant Daniel, put his hands up above his head with his palms facing out, then he dove onto the floor. (Daniel Dep. at 89:17-21)

Sergeant Daniel quickly determined this man was no threat. (Daniel Dep. at 90:7-8) Daniel then scanned to his right and saw another man standing in the living room with a cigarette. (Daniel Dep. at 91:13-15) This man also put his hands above his head and then dove to the floor. (Daniel Dep. at 91:17-19, 22)

## DISCOVERY OF MR. BOLTON

Sergeant Daniel then made a pivot to his right, still at the doorway, and he saw a man seated on a couch that was situated against the wall to Daniel's right. (Daniel Dep. at 94:21, 93:6-12) The man was facing Sergeant Daniel, with his right foot on the floor and his left leg on the couch. (Daniel Dep. at 114:5 – 115:2) The man's arms appeared to be in a classic shooting position, stable and focused and pointing at Sergeant Daniel. (Daniel Dep. at 95:3-6) (Daniel Declaration at ¶ 14)

Sergeant Daniel was a firearms instructor. (Daniel Dep. at 19:6-7; 112:11-13) In Sergeant Daniel's experience the only reason for anyone to assume the arm

position of the man on the couch was when holding a gun. (Daniel Declaration at ¶ 15) Sergeant Daniel believed the man was pointing a gun at him and the other officers at the door. (Daniel Dep. at 95:3-9) Sergeant Daniel immediately yelled in fear of being shot by the man. (Daniel Dep. at 98:13-15)

Sergeant Daniel was approximately six to eight feet from the end of the man's hands. (Stuart Dep. at 50:17 - 51:8 & Exhibit 2 (scene diagram with dimensions)) (Daniel Dep. at 94:21, 99:3-6, 116:9-20 (fired from the front doorway while Bolton was on the couch)) Sergeant Daniel responded by firing three times at the man. (Daniel Dep. at 98:4-5) The first gunshot occurred close in time to the interior flashbang detonation. (Daniel Declaration at ¶ 10-11 & Exhibits 2 and 3) All three shots occurred within approximately one second. (Daniel Declaration at ¶ 10-11 & Exhibits 2 and 3)

Through the shield Sergeant Daniel saw an orange light that he believed was a muzzle flash. (Daniel Dep. at 95:19-22) Sergeant Daniel yelled "gun, gun, gun!" and tucked back behind the door frame to check himself for bullet wounds. (Daniel Dep. at 98:8-18) Sergeant Daniel stated that Bolton had something in his hands. (Pearson Dep. at 44:8-10).

## AFTERMATH

Two bullets struck Mr. Bolton.[2] Consistent with Bolton holding his arms in

---

2 A third bullet was found in a chair behind Bolton, having passed through a desk. The evidence indicates this bullet did not strike Bolton. (Stuart Dep. at 17:24-25, 18:3-22, 22:17-18 & Exhibits 6 & 12) The bullet trajectory was angled down

front of him, each bullet hit an arm and then his chest. (Dr. Desamours Dep. at 14:12-25, 16: 7-9, 42-44,  57:10 - 21 & Exhibits 26 & 27)  Bolton died from blood loss. (Dr. Desamours Dep. at 15:14-18) Bolton was high on cocaine at the time. (*Id*. at 69:25,70:1-6; 71:22 – 72:1)

Blood stain patterns from Bolton's hands revealed he was clutching a cell phone between his hands. (Dr. Desamours Dep. at 17:19 – 18:8, 20:13 – 20:14 & Exhibits 23 (page 3) & 24 (page 3)) Bolton's cell phone was covered in blood. (Stuart Dep. at 13:20-25; 14:1-18 & Exhibit 4)

After the chaos lessened, the apartment's numerous occupants eventually came out. (Mosby Dep. at 51:1-18) Hours later, GBI analysts surveyed the scene and collected evidence. (Stuart Dep. at 59:13-20) GBI found a 9 millimeter pistol in the kitchen, roughly six yards from Bolton's position on the couch. (Stuart Dep. at 52:8-21 Exhibit 5 page 4) (MSJ Exhibit 2) Officers found an unspent 9 millimeter bullet in the couch where Bolton was sitting. (Stuart Dep. at 10-11 & Exhibit 3)

Officers found a box of 12-gauge shotgun shells and a full ammunition clip for a pistol that was not in the apartment. (Stuart Dep. at 14:19-21, 38:23 – 39:13 & Exhibit 8) Police also found illegal drugs of various types. (Sterner Dep. at 30-31 & Exhibit 18 pp. 4-5 (inventory)) Later, investigators learned that the leader of the drug gang had removed most of the guns (including a shotgun) and drugs from the

---

from the front door over the west couch. (Stuart Dep. at 27:12-15; 28:24-25; 29:1-4; 31:9-17)

apartment hours before the raid, having become concerned about a raid. (Sterner Dep. at 111:4-18, 129:9 – 130:3) This removal of firearms shortly before the raid explains why Bolton did not his usual shotgun.

A person who holds a cell phone as if holding a gun can be practically indistinguishable from someone presenting a gun. (Daniel Declaration at Exhibit 6) Also, Sergeant Daniel was aware of commercially available firearm products that have the size and shape of cell phones. (Daniel Declaration at Exhibits 4 & 5)

## ARGUMENT AND CITATIONS OF AUTHORITY

### I. QUALIFIED IMMUNITY PROTECTS SERGEANT DANIEL BECAUSE HE REASONABLY PERCEIVED IMMINENT LETHAL DANGER

The Fourth Amendment analysis turns on whether Sergeant Daniel had probable cause that Bolton posed an imminent threat of serious bodily harm. Probable cause is the quantum of information sufficient to allow "a reasonable officer [to] conclude . . . that there was a substantial chance" of an imminent deadly threat. See *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018) (arrest case). Qualified immunity lowers that standard even further. The qualified immunity inquiry is whether Sergeant Daniel had *arguable probable cause*.

The qualified immunity standard is intentionally low, in part because officers sometimes have to make split-second, life and death decisions with incomplete information. This case is a perfect example.

> [A]n officer need only have arguable probable cause, not actual probable
> cause, in order to qualify for immunity from a Fourth Amendment claim.
> *See Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir.1997). Regardless of
> whether probable cause actually existed, an officer is entitled to immunity
> if he "reasonably could have believed that probable cause existed, in light
> of the information the officer possessed." *Id.* Qualified immunity thereby
> protects officers who "reasonably but mistakenly conclude that probable
> cause is present." *Id.* (quotation marks and citation omitted).

*Garczynski v. Bradshaw*, 573 F.3d 1158, 1167 (11th Cir. 2009) (deadly force case).

To show lack of arguable probable cause, Plaintiffs "must demonstrate that *no*
*reasonable officer* could have found probable cause under the totality of the
circumstances." *Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir.2004)
(emphasis supplied).

The upshot is that qualified immunity applies even if Sergeant Daniel's
undisputed belief that he faced a deadly threat turns out to have been mistaken.
What matters is whether his judgment was supportable under the incomplete
information that he reasonably relied upon. As discussed below, Sergeant Daniel
had arguable probable cause to believe that Bolton was poised to fire at Daniel and
his fellow officers. Therefore, qualified immunity protects Defendant.

### A.  Fundamental Fourth Amendment Standards

Plaintiffs assert an excessive force claim based on Sergeant Daniel's use of
deadly force in self defense. In *Hammett v. Paulding Cty.*, 875 F.3d 1036 (11th Cir.
2017), the Eleventh Circuit summarized the governing Fourth Amendment
parameters as follows:

> Reasonableness is the touchstone for all excessive force claims, regardless of whether the force used was deadly. See *Garczynski*, 573 F.3d at 1166. "As to deadly force, a police officer may use such force to dispel a threat of serious physical harm to either the officer or others … ." *Singletary v. Vargas*, 804 F.3d 1174, 1181 (11th Cir. 2015). "We have held that it is reasonable, and therefore constitutionally permissible, for an officer to use deadly force when he has 'probable cause to believe that his own life is in peril.' " *Id.* (quoting *Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005)); see also *Morton v. Kirkwood*, 707 F.3d 1276, 1281 (11th Cir. 2013) ("In the deadly force context, we have observed that a police officer may constitutionally use deadly force when the officer ... has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others ...." (quotation omitted)).

*Hammett*, 875 F.3d at 1048. "It is axiomatic that when an officer is threatened with deadly force, he may respond with deadly force to protect himself." *Hunter v. Leeds*, 941 F.3d 1265, 1279 (11th Cir. 2019).[3]

When the Court considers probable cause, "[t]he only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded." *Garczynski*, 573 F.3d at 1166. "The calculus of reasonableness must embody

---

[3] Courts often use a multifactor analysis to judge excessive force claims. See *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 822 (11th Cir. 2010). But where there is no intent to arrest, "severity of the crime" and "resistance to arrest" do not fit in any obvious way. All other factors aside, courts recognize that imminent risk to an officer's life overrides any other factor and *per se* justifies deadly force. See *Powell v. Snook*, 25 F.4th 912, 922-23 (11th Cir. 2022). If one wishes to consider severity of a crime, then a deadly threat to an officer always is an aggravated assault (see O.C.G.A. § 16-5-21 (a)), and otherwise the context for criminal activity is "relevant to whether the officer was reasonable in evaluating ambiguous conduct to assess the threat." *Estate of Valverde v. Dodge*, 967 F.3d 1049, 1061 (10th Cir. 2020). This case involves a well-armed drug organization and pre-raid information about an armed "doorman," which automatically carried a high probability for lethal violence and justified belief that arguably "ambiguous" conduct was threatening. As for resistance to arrest, "anyone who appears to be ready to shoot an officer certainly appears to be ready to resist arrest." *Id.*

allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989) (also explaining that a "standard of reasonableness at the moment applies"). If ever there was a "split-second" case, this is it.

Finally, "the law does not require officers in a tense and dangerous situation to wait until the moment a suspect" causes harm. *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007). Deadly force may be used preemptively. *Id.* Where an officer had to make an "on-the-spot judgment" in a "tense, uncertain and rapidly evolving" situation, reasonableness includes a "built-in measure of deference to the officer's on-the-spot judgment." *Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015). As discussed below, Sergeant Daniel had arguable probable cause that Bolton presented a lethal threat. Therefore, qualified immunity protects Sergeant Daniel from liability.

### B. Under the Circumstances Sergeant Daniel Reasonably Believed that Bolton Was Pointing a Gun at Him

The totality of the circumstances (*i.e.*, the big picture) is critical in this case.[4]

That picture shows this was a high-risk SWAT raid, with specific information that a

---

4 See *Varnadore v. Merritt,* 778 F. App'x 808, 814 (11th Cir. 2019) ("what happens next is, *in the light of everything that came before*, most critical to our disposition of this appeal." (emphasis supplied)); *Garrett v. Athens-Clarke County, Ga.*, 378 F.3d 1274, 1280 (11th Cir. 2004) ("courts must look at the totality of the circumstances: not just a small slice of the acts that happened at the tail of the story.")

"doorman" on a couch with a firearm would be guarding the front door. In the chaos of the opening seconds of the raid, officers yelled for occupants to show their hands and get on the ground. Two men complied, and Sergeant Daniel did not fire on them. Bolton acted differently.

Instead of getting on the ground, Bolton sat right where he had been warned the "doorman" would be. Rather than putting his hands in a position to show he was not a threat, Bolton had his hands together in a shooting position. Given the context and the pre-raid information about an armed "doorman", Sergeant Daniel reasonably concluded that Bolton had his arms and hands in a shooting position because he was bringing a weapon to bear. If that highly probable assessment was right, there was no time to wait and see what Bolton would do.

The situation was rapidly evolving and chaotic. At close range in the smoky darkness, a man holding his arms in a shooting position confronted Sergeant Daniel. Daniel was standing in a "fatal funnel," and he Daniel had only a moment to decide whether to defend himself, versus taking the deadly risk of being shot or allowing the shooting of a fellow officer.[5] A reasonable police officer could have believed

_____

5    Officers recognize doorways as "fatal funnels" that make them "easy targets for armed occupants." See, *e.g.*, *Carroll v. Cty. of Monroe*, 712 F.3d 649, 650-51 (2d Cir. 2013); *Estate of Escobedo v. Hunter*, No. 1:05-CV-424-TLS, 2011 U.S. Dist. LEXIS 57003, at *54 (N.D. Ind. 2011). This is because officers have no alternative but to go through the doorway, and their maneuver space is highly constrained. An armed person on the other side does not have to guess about where to aim.

that "[i]f [he] paused for even a instant, [he] risked losing [his] last chance to defend" himself and other officers. *Waterman v. Batton*, 393 F.3d 471, 478 (4th Cir. 2005).

"[T]he law does not require [an officer] in a tense and dangerous situation to wait until the moment a suspect" fires. *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir.2007). Officers are not required to gamble with their lives by taking a "chance and hop[ing] for the best." *Id.* at 583 (11th Cir. 2007) *(*citing *Scott v. Harris*, 550 U.S. 372, 385 (2007)). Under the circumstances, Sergeant Daniel was entitled to defend himself by firing at the doorman who apparently was pointing a gun at him in the smoke-filled room.

## II.   QUALIFIED IMMUNITY PROTECTS SERGEANT DANIEL BECAUSE HE DID NOT VIOLATE CLEARLY ESTABLISHED LAW

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011); see *Foy v. Holston*, 94 F.3d 1528, 1534 (11th Cir. 1996).

Qualified immunity applies when an officer acts within his discretionary authority, which is the case because Sergeant Daniel acted as a SWAT officer on a police raid. See *Sampson v. City of Brunswick*, 549 F. App'x 858, 860 (11th Cir. 2013). Therefore, Plaintiffs bear the burden to show that (1) Sergeant Daniel

violated  Bolton's constitutional right against excessive force, and (2) this right was clearly established at the time of the alleged violation. *Cozzi v. City of Birmingham*, 892 F.3d 1288, 1293 (11th Cir. 2018).  The following parameters govern application of qualified immunity.

### A.  "Clearly Established Law" Must Be Specific

To meet their burden, Plaintiffs must show that "existing precedent … placed the ... constitutional question ***beyond debate***." *Reichle v. Howards*, 566 U.S. 658, 664, 132 S.Ct. 2088 (2012). The Supreme Court has "repeatedly told courts ... not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*,  572 U.S. 765, 779, 134 S. Ct. 2012, 2023 (2014) (internal punctuation and citation omitted). The Eleventh Circuit has said the same thing. See, *e.g.*, *Gilmore v. Hodges*, 738 F.3d 266, 278 (11th Cir.2013).

### B.  Specificity is Particularly Important in Use of Force Cases

"[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015).

> Use of excessive force is an area of the law "in which the result depends very much on the facts of each case," and thus police officers are entitled

to qualified immunity unless existing precedent "squarely governs" the specific facts at issue. [*Mullenix*,] 136 S.Ct., at 309 (internal quotation marks omitted and emphasis deleted).

*Kisela v. Hughes*, 584 U.S. —, 138 S. Ct. 1148, 1153 (2018).

In regard to the Fourth Amendment claim against Sergeant Daniel, qualified immunity is the norm unless the issue is settled in Plaintiffs' favor "beyond debate."

*See Reichle*, 566 U.S. at 664, 132 S.Ct. 2088.

> "Because excessive-force claims are inherently fact specific, 'generally no bright line exists for identifying when force is excessive; we have therefore concluded that unless a controlling and materially similar case declares the official's conduct unconstitutional, a defendant is usually entitled to qualified immunity.' *Priester*, 208 F.3d at 926. Put differently, '[c]oncrete facts are generally necessary to provide an officer with notice of the hazy border between excessive and acceptable force.' " *Fils v. City of Aventura*, 647 F.3d 1272, 1291 (11th Cir. 2011) (internal quotation marks omitted).

*Johnson v. Conway*, 688 F. App'x 700, 706 (11th Cir. 2017).

In excessive force cases the Supreme Court and Eleventh Circuit normally grant qualified immunity unless there is a binding decision that clearly told the officer his action violated the Fourth Amendment. See, *e.g.*, *City of Tahlequah v. Bond*, 595 U.S. 9, 142 S. Ct. 9, 12 (2021) (reversing denial of qualified immunity where "Neither the panel majority nor the respondent ... identified a single precedent finding a Fourth Amendment violation under similar circumstances."); *Powell v. Snook*, 25 F.4th 912, 921-923 (11th Cir. 2022) (surveying case law and finding no similar case that would overcome qualified immunity). As discussed

below, the similar decisions favor Sergeant Daniel, so qualified immunity applies.

### C. Similar Eleventh Circuit Precedents Require Qualified Immunity

Plaintiffs likely will argue that the nearest gun to Bolton was found in the kitchen six yards away, not with Bolton. That is not a material fact because many reported cases involve officers firing at suspects who appeared ready to use guns, but who turned out not to have guns.[6] The question in each case is whether the officer reasonably perceived an imminent threat of deadly harm, in light of the information reasonably believed by the officer. Courts account for the information officers had when they were forced to make a decision, rather than information discovered after the dust settled. The Fourth Amendment only requires that officers act on a reasonable basis—not perfection, omniscience or even correctness.

Two Eleventh Circuit cases strongly support qualified immunity in this case. The first is *Hammett v. Paulding Cty.*, **875 F.3d 1036** (11th Cir. 2017), where officers tried to execute a search warrant for drugs in a dark house. In *Hammett*:

The officers entered a dark and cluttered house after knocking and

---

6 See, *e.g., Carr v. Tatangelo*, 338 F.3d 1259, 1269 n.19 (11th Cir. 2003) ("A reasonable but mistaken belief that probable cause exists for using deadly force is not actionable under § 1983."); *Wells v. Talton*, 695 F. App'x 439 (11th Cir. 2017) (finding no Fourth Amendment violation where officer shot unarmed man in the back of the head, under mistaken belief the man had a gun). In the same vein, the Eleventh Circuit has decided a handful of cases involving suspects with realistic-looking toy guns or BB guns. *Thorkelson v. Marceno*, 849 F. App'x 879 (11th Cir. 2021) (BB gun); *Penley v. Eslinger*, 605 F.3d 843 (11th Cir. 2010) (toy gun that looked like a real gun). These cases hold that where officers lack knowledge that the suspect's "weapon" cannot cause deadly harm, officers are entitled to use deadly force in the same manner as if the toy or BB gun is a deadly weapon.

announcing for some time. As they moved through the building, they continually announced they were from the Sheriff's Office and they were executing a warrant, to no response. All of the sudden, a large man appeared in the hallway, saying nothing to the officers and giving no indication that he intended to cooperate even though the officers knew that he must have heard their announcements. Instead, he refused to obey their commands to show his hands, shifted an object between his hands, and rapidly approached them, drawing the object up toward the face of the lead officer. In the darkness, given the foregoing circumstances, the officers had probable cause to believe it was a weapon and that Hammett intended to use it.

*Hammett*, 875 F.3d at 1050.

Officers shot the man with the object in his hand. It turned out the man did not have a deadly weapon. *Id.* at 1078. The Eleventh Circuit held that deadly force was authorized under the Fourth Amendment. *Id.* at 1073.

Like this case, *Hammett* involves officers working in a dark space to deal with drug suspects. But this situation was far more chaotic and Sergeant Daniel had specific information that an armed person would be guarding the door. Like the officers in *Hammett,* Sergeant Daniel was confronted by a suspect in very close proximity who did not behave normally, did not obey officer commands and whose position and actions reflected an imminent deadly force threat. In *Hammett* and here, the suspect appeared to be bringing a deadly weapon to bear.

Sergeant Daniel saw Bolton with his hands together in a shooting position, and Daniel had very specific information that a "doorman" would be armed with a gun with intent to attack anyone perceived as an intruder. Bolton's position and

behavior fit that pattern. The darkness, smoke and chaos made clarity impossible, but Sergeant Daniel immediately had to decide whether to defend himself and other officers or risk being shot. As in *Hammett*, here Daniel had arguable probable cause to believe that Bolton posed a deadly threat, and there was no time to do anything but react. The basis for deadly force is stronger here than in *Hammett,* which compels qualified immunity.

More recently the Eleventh Circuit decided **Varnadore v. Merritt, 778 F. App'x 808 (11ᵗʰ Cir. 2019)**, where an officer shot an unarmed man during a traffic stop. The suspect refused orders, abruptly jumped out of his truck, faced the officer, and quickly raised his right arm toward the officer "and away from his beltline as if pulling a gun from his waist." *Id.* at 814. The officer fired under the belief that the suspect was about to use a gun. He was not, but the Eleventh Circuit held the shooting was reasonable, a "conclusion [that is] not altered by the fact that [the suspect] turned out to be unarmed." *Varnadore*, 778 F. App'x at 815.

Similar to *Varnadore*, here the circumstances told Sergeant Daniel that Bolton was armed and about to fire. Moreover, this SWAT raid on a drug house was far more chaotic and carried a higher probability of danger than the DUI traffic stop in *Varnadore*. In contrast to *Varnadore,* here Sergeant Daniel's pre-existing information warned him about an armed threat who would probably act exactly as Bolton did. Bolton refused officer commands, did not act like a normal non-

threatening person in response to a flashbang and clear police commands, and he held his arms in a shooting position. *Varnadore* supports qualified immunity.

In light of these supporting precedents, qualified immunity bars this claim. Sergeant Daniel had the right to defend himself and fellow officers against an apparent imminent attack from Bolton, who fit the armed "doorman" pattern perfectly. In the face of these precedents, Plaintiffs have to show that "*no reasonable officer* could have found probable cause under the totality of the circumstances." *Kingsland*, 382 at 1232 (emphasis supplied). With due respect, it would be hard to find another competent officer who—with his own life and the lives of fellow officers on the line—would *not* have believed that Bolton posed an imminent deadly threat under these circumstances.

**D**. **Similar Circuit Court Precedents Require Qualified Immunity**

While out of circuit decisions cannot clearly establish the law in this Circuit, they can support qualified immunity by showing that federal judges do not view the law as settled, or alternatively that the law favors an officer. *Coffin v. Brandau*, 642 F.3d 999, 1017 n.16 (11th Cir. 2011); *Youmans v. Gagnon*, 626 F.3d 557, 565 (11th Cir. 2010). As applied here, cases from other circuits support qualified immunity.

One such case is ***Escalera-Salgado v. United States*, 911 F.3d 38 (1st Cir. 2018)**, where officers executed a search warrant at the house of a suspected drug trafficker. *Id.* at 39. Officers believed the suspect had guns in the house. *Id.* When

the suspect appeared, an officer yelled "police" and commanded him to show his hands and stay still. *Id*. The suspect ignored these commands and instead reached for his waistband, causing two officers to shoot him. *Id*. The suspect had no gun, and there was no "bulge" in his waistband. *Id.*

The First Circuit granted qualified immunity, holding that despite no actual view of a weapon, the officers had "ample reason to suspect danger" due to their belief that the suspect was armed, the suspect's failure to comply with police commands, and the suspect's behavior suggesting that he was reaching for a weapon. *Id*. at 41-42. In 2018, "no case law clearly establishing that actually seeing a weapon is the *sine qua non* of reasonableness in circumstances such as those presented here -- where the officers were forewarned that [the suspect] might well be armed and dangerous, and where [his] behavior would lead almost anyone to believe he was reaching for a weapon." *Escalera-Salgado*, 911 F.3d at 41-42.

*Escalera-Salgado's* resemblance to the present case is fairly obvious, but Sergeant Daniel faced higher pressure and had greater reason to perceive lethal danger. Sergeant Daniel found himself standing in a confined doorway facing a man whose position and behavior fit the description of the reportedly armed, violent "doorman." And Bolton was not merely reaching for his waistband. Bolton had his hands together, apparently bringing a weapon to bear. *Escalera-Salgado* strongly supports qualified immunity.

Likewise, in **Hudspeth v. City of Shreveport, 270 F. App'x 332 (5th Cir. 2008)**, the Fifth Circuit granted qualified immunity to officers who shot a suspect in the back. *Id*. at 333. The officers fired because the man "pointed his cell phone at [an officer] … with two hands and arms outstretched, as if he was aiming a handgun." *Id.* The suspect was otherwise unarmed, which the Fifth Circuit found "irrelevant." *Id.* at 337. Officers reasonably believed the man presented a gun, which justified deadly force. The same is true here.

Generally, the federal reports contain a multitude of cases holding that police reasonably shot unarmed suspects in the mistaken belief that the suspects were reaching for a gun. See, *e.g.*, *Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001) (shooting of unarmed suspect who was trying to turn off his radio to hear and comply with police commands); *Trupin v. Mueller*, 37 F. App'x 151 (6th Cir. 2002) (holding officer reasonably shot an unarmed suspect who appeared to be reaching for a gun on his waist); *Reese v. Anderson*, 926 F.2d 494, 501 (6th Cir. 1991) (holding officer reasonably shot an unarmed suspect who reached into a car to grab something the officer believed was a gun).

The upshot is that federal courts across the country recognize that officers can fire at suspects who—like Bolton—appear to present deadly threats, even where information discovered after the shooting provides an argument that the suspect was unarmed and did not pose a lethal threat. These cases strongly support qualified

immunity.

### E.  Plaintiffs Cannot Show a Clearly Established Fourth Amendment Violation

Qualified immunity was made for situations like this one. Plaintiffs have to show that "existing precedent … placed the statutory or constitutional question **beyond debate**." *Reichle*, 566 U.S. at 664. Under the facts reasonably believed by Sergeant Daniel, arguable probable cause existed that Bolton was poised to fire. Daniel had no time for investigation or debate. He had a split second to decide whether to defend himself and other officers. Because no case told Sergeant Daniel that firing under these circumstances clearly violated the Fourth Amendment, and multiple cases support Sergeant Daniel, qualified immunity bars Plaintiffs' excessive force claim.

## III.   OFFICIAL IMMUNITY BARS PLAINTIFFS' STATE LAW CLAIMS

Plaintiffs pleaded state law tort claims for battery and wrongful death. Doc. 1 at Count 2. Official immunity bars state law claims against a police officer who uses deadly force unless the officer acted with intent to injure Mr. Bolton illegally, termed "actual malice." *See* Ga. Const. of 1983, Art. I, Sec. 2, Par. IX (d); *Cameron v. Lang*, 274 Ga. 122, 123(1), 549 S.E.2d 341 (2001).

For a plaintiff to prove actual malice, there must be some evidence that the officer intended to act illegally in a manner that harms the suspect. *Wyno v. Lowndes Cty.*, 305 Ga. 523, 531, 824 S.E.2d 297 (2019).

> Actual malice is a demanding standard: it requires an officer to act with "a deliberate intention to do a wrongful act." *Adams v. Hazelwood,* 520 S.E.2d 896, 898 (Ga.1999). True, a jury can infer actual malice based on an officer's conduct. *See Lagroon v. Lawson,* 759 S.E.2d 878, 883 (Ga.Ct.App.2014). But **unreasonable conduct does not support such an inference**. *See Bashir v. Rockdale Cty.,* 445 F.3d 1323, 1333 (11th Cir.2006); *Marshall v. Browning,* 712 S.E.2d 71, 75 (Ga.Ct.App.2011); *Anderson v. Cobb,* 573 S.E.2d 417, 419 (Ga.Ct.App.2002). **Even recklessly illegal conduct does not support an inference of actual malice**. *See Murphy v. Bajjani,* 647 S.E.2d 54, 60 (Ga.2007); *Daley v. Clark,* 638 S.E.2d 376, 386 (Ga.Ct.App.2006).

*Black v. Wigington,* 811 F.3d 1259, 1266 (11th Cir.2016) (emphases supplied).

Notably, a lack of objective justification to use self defense does not, standing alone, support actual malice. *See Selvy v. Morrison*, 292 Ga. App. 702, 706, 665 S.E.2d 401 (2008) (lack of probable cause did not show actual malice); *Reed v. DeKalb Co.*, 264 Ga.App. 83, 86, 589 S.E.2d 584, 588 (2003) (same). Therefore, even if Sergeant Daniel's conduct had been "unreasonable" in the Fourth Amendment sense, that is something far different from the "actual malice" required to pierce official immunity. *See Black,* 811 F.3d at 1266. Here, nothing in the record supports that Sergeant Daniel intended to illegally harm Bolton. If Plaintiffs have any case, it is based on the idea that Sergeant Daniel made a mistake, not that he intentionally shot a man who he knew posed no harm.[7]

Georgia law does not put officers in a "damned if you do, damned if you

---

[7] If Sergeant Daniel had wanted to shoot people regardless of cause, it makes no sense that before firing he declined to fire at two other people in the same room as Bolton. The fact is that Sergeant Daniel's decisions were based on prior information, split-second threat assessments and the behavior of the people in the room, not based on intent to shoot someone without cause.

don't" situation. That is, when faced with a potentially deadly situation under ambiguous circumstances, an officer does not have to choose between risking his life and facing civil damages. Georgia law provides officers with authority to protect themselves and immunity from civil claims, unless they act with actual intent to use illegal force to harm the suspect.

Here, Sergeant Daniel's conduct was justified by self defense and defense of fellow officers. The record does not even hint that Sergeant Daniel's decision to use deadly force was motivated by an intent to act illegally. Rather, his decision to fire was triggered by Bolton's actions, which looked like the type of attack that Sergeant Daniel had been warned about before the raid. Plaintiffs will argue that Sergeant Daniel was factually mistaken, but that is something very different from "actual malice." Accordingly, official immunity entitles Sergeant Daniel to summary judgment on the state law claims.

## CONCLUSION

For the foregoing reasons, Defendant is entitled to summary judgment.

Respectfully submitted,

WILLIAMS & WAYMIRE, LLC


/s/ *Jason Waymire*_____

Jason C. Waymire
Georgia Bar No: 742602
Attorney for Defendant

4330 South Lee St., NE
Building 400, Suite A
Buford, Ga 30518-3027
Telephone: (678) 541-0790
Facsimile: (678) 541-0789
jason@wmwlaw.com

## **CERTIFICATION OF COMPLIANCE WITH L.R. 5.1(B).**

Counsel for Defendants certifies that the foregoing Brief complies with the

font and point size requirements of Local Rule 5.1(B).